IN THE UNITED STATES COURT DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JILL ANN SORENSEN,<br><br>          Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY aka THE HARTFORD,<br><br>          Defendant. | Case No. 4:21-cv-00286<br><br><br><br>MEMORANDUM DECISION & ORDER |

## I

## INTRODUCTION

On June 30, 2021, Plaintiff Jill Ann Sorensen ("Sorensen") filed suit against

The Hartford Life and Accident Insurance Company ("The Harford"), alleging that

The Hartford wrongfully denied Sorensen long-term disability benefits under the

benefit plan, established by Sorensen's employer, Peter Kiewit Sons', Inc., and

pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

Both parties filed cross-motions for summary judgment relating to the denial

of long-term disability benefit payments. A hearing was held on June 6, 2022. The

court has reviewed and considered the administrative record ("AR"), the briefing of the parties, and the oral arguments. Based on this record, and reasonable inferences drawn therefrom, the court grants summary judgment to Sorensen and denies summary judgment to The Hartford.

## II

## FINDINGS OF FACT

### 1.    *The Plan*

Sorensen was an employee of Peter Kiewit Sons', Inc. As an employee, she was a beneficiary of a long-term disability benefit plan, funded by an insurance policy issued by The Hartford. The ERISA Plan (the "Plan") granted The Hartford the discretion to administer the Plan and interpret the insurance policy. AR 3258, 3311; *see also* 29 U.S.C. § 1002(16)(A)(i).

The Plan allows for short-term and long-term disability benefits, if the participant (1) "become[s] Disabled while insured under The Policy"; (2) is "Disabled throughout the Elimination Period"; (3) "remain[s] Disabled beyond the Elimination Period"; and (4) "submit[s] Proof of Loss" to The Hartford. AR 3250, 3289. The Plan defines disability as follows:

> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:

1) Your Occupation during the Elimination Period;[1]
2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

AR 3258, 3296–97. Disability includes both physical disability and mental illness. *See* AR 3259, 3297. Relevant here is whether Sorensen meets the third prong of the Plan's definition of disability[2]: unable to "perform[] one or more of the Essential Duties of: . . . Any Occupation." AR 3258, 3296–97.

The Plan defines "Any Occupation" as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or 2) the Maximum Monthly Benefit." AR 3258, 3296.

The Plan also provides the manner in which an appeal of the initial benefits determination will be determined:

The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the

---

[1] The Plan defines "Elimination Period" as "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law." AR 3259.

[2] The Plan limits benefits for "Mental Illness" Disability to a "total of 24 months." AR 3289.

individual who made the initial benefit decision, nor the subordinate of such individual. The review process provides for the identification of the medical or vocational experts whose advice was obtained in connection with an initial adverse decision, without regard to whether that advice was relied upon in making that decision. When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.

AR 3273. The Hartford claims this process avoids a conflict of interest.

### 2.   *Medical History*

Sorensen has been diagnosed with multiple medical conditions, including but not limited to (1) chronic fatigue syndrome, AR 1636, 1677; (2) fibromyalgia, AR 2314, 2328; (3) chronic pain and dysphasia, AR 1678; (4) cervical spine degenerative disc disease, AR 616, 667; (5) lumbar spine degenerative disc disease, AR 767, 1300; (6) Hashimoto's thyroiditis, AR 2383; (7) prediabetes, AR 432; (8) irritable bowel syndrome, AR 1648, 1994; (9) rheumatoid arthritis, AR 393; (10) depression, AR 601; and (11) anxiety disorder. *See* AR 3145–46.

Sorensen has been treated by several medical providers for her physical disabilities over the relevant period.[3] Brett Smith, PA, was Sorensen's primary care provider from September 2016 through November 2018. Throughout this period,

---

[3] The court does not address all of Sorensen's medical providers' opinions. Instead, the court highlights the records evidencing Sorensen's multiple diagnoses.

Smith diagnosed, treated, or referred Sorensen for Epstein-Barr virus disease, hypothyroidism, fibromyalgia, Chiari malformation, diarrhea, chronic pain, chronic fatigue syndrome, sleep apnea, irritable bowel syndrome, post traumatic stress disorder ("PTSD"), major depressive disorder, and bipolar disorder.

Following Brett Smith, Heidi Walker, PA-C, was Sorensen's primary care provider. She similarly diagnosed, treated, or referred Sorensen for chronic fatigue, inflammatory arthritis, degenerative disc disease with chronic neck and back pain, prediabetes, thyroid issues, sleep apnea, irritable bowel syndrome, PTSD with panic disorder, bipolar, multiple personality.

Corey Walker, MD, rheumatologist, saw Sorensen at the request of Brett Smith. Dr. Walker examined Sorensen and diagnosed her with fibromyalgia with diffuse and chronic joint and muscle pain, diffuse myofascial tenderness, chronic insomnia, bilateral knee pain, chronic fatigue, irritable bowel syndrome, obstructive sleep apnea, Hashimoto's thyroiditis, and depression with anxiety.

Ananda Walaliyadda, MD, and Monika Jarzmik, NP, treated Sorensen for her rheumatoid arthritis at the Arthritis Specialty Center, following Dr. Walker's assessment. Sorensen was diagnosed with primarily inflammatory polyarthropathy. However, Dr. Walaliyadda also assessed Sorensen for joint pain, low back pain, fibromyalgia, fatigue, depression, and other synovitis and tenosynovitis, multiple

sites.

Patrick Cindrich, MD, saw Sorensen at the request of Brett Smith. Dr.
Cindrich diagnosed Sorensen with cervical disc degeneration, lumbago, and
tendinitis. Dr. Cindrich referred Sorensen to the Pain & Spine Specialist of Idaho.

Tyler Hepworth, PA-C, and Timothy Snell, MD, (Pain & Spine Specialist of
Idaho) treated Sorensen for polyarthralgia, fibromyalgia, chronic neck and low
back pain, and chronic pain syndrome.

Jeremy W. Hale, DC, treated Sorensen for her spine pain. Hale noted
Sorensen's subjective complaints of thoracic, mid-thoracic spine, cervical spine,
lumbar spine, and sacroiliac joint discomfort and pain that becomes worse with
high-stress levels. Based on Sorensen's complaints and x-rays, Sorensen was
diagnosed with subluxation of cervical region; myalgia of auxiliary muscles, head
and neck; subluxation of thoracic region; pain in thoracic spine; subluxation of
lumbar region; and low back pain.

Sydnie Hobbs, FNP-C, was Sorensen's primary care provider following
Heidi Walker. Hobbs treated and diagnosed Sorensen with rheumatoid arthritis,
fibromyalgia, Hashimoto's Thyroid disease, chronic pain, chronic fatigue,
depression, and anxiety. Hobbs reported that, pursuant to the functional capacity
evaluation, Sorensen was rated at a "Sedentary Demand Capacity." However,

Sorensen was unable to work full time, because of fatigue.

### 3.   *Claim History*

Sorensen was employed as a heavy equipment operator/truck driver from May 19, 2015, through April 20, 2017. AR 3289. Sorensen's job required her to work 12-hour shifts for five days per week. AR 3204. The essential job functions included operating equipment "in a rugged terrain and sit[ting] for long periods of time." AR 3204. Sorensen was required to "climb a ladder to get on and off equipment," "[t]wist and turn while sitting and standing"; and "[l]ift[] up to 49 pounds." AR 3204.

On May 1, 2017, Sorensen applied for Short Term Disability benefits through The Hartford. AR 3191–93, 3211–12. Such application was based on the report of her primary care provider, Brett Smith. The report noted Sorensen's primary conditions impacting her activity as fibromyalgia and major depressive disorder. AR 3209–10, 3194–95. Smith listed Sorensen's work restrictions as follows:

- •   Sit: continuously – 1 hour at a time for 8 hours in an 8-hour day
- •   Stand: intermittently – 1 hour at a time for 3 hours in an 8-hour day
- •   Walk: intermittently – 1 hour at a time for 2 hours in an 8-hour day

AR 3209–10, 3194–95. Smith further restricted Sorensen's kneeling and climbing to never; lifting of 10 pounds maximum, bending, and balancing for at most 2.5

hours; and driving for at most 2.5 to 5.5 hours. AR 3210, 3195.

On May 26, 2017, The Hartford approved Sorensen's Short Term Disability benefits, which were extended through June 21, 2017. AR 4, 13. On June 28, 2017, Brett Smith filed a progress report with The Hartford. AR 3163–64. He noted Sorensen's primary conditions as fibromyalgia and Addison's disease. Smith listed Sorensen's work restrictions as follows:

- Sit: intermittently – 1 hour at a time for 2 hours in an 8-hour day
- Stand: intermittently – 1 hour at a time for 3 hours in an 8-hour day
- Walk: intermittently – 1 hour at a time for 2 hours in an 8-hour day

AR 3163–64. Smith further restricted Sorensen's lifting of 25 pounds maximum, kneeling, climbing, bending, and balancing for at most 2.5 hours and driving for at most 2.5 to 5.5 hours. AR 3164. Smith filed additional progress reports on August 9, 2017; September 27, 2017; and November 28, 2017, with the same restrictions.[4] AR 3152–53, 3122–23, 2323–24. Hartford extended Sorensen's short-term disability benefits through September 30, 2017. AR 3102.

On September 30, 2017, Sorensen applied for long-term disability benefits. AR 2568. Upon receipt of the application, The Hartford asked Joseph Rea, MD, to

---

[4] On November 12, 2018, Brett Smith filed another progress report with The Hartford. AR 2101–02. Smith noted that Sorensen's condition had "retrogressed," however, he only lessened her lifting restrictions to 10 pounds, otherwise, the restrictions remained largely the same

evaluate Sorensen's medical record on behalf of The Hartford. AR 2298–03; *see also* AR 3096–97. On December 19, 2017, Dr. Rea filed his report. He noted diagnoses of fibromyalgia, irritable bowel syndrome, chronic headache, and degenerative joint disease. AR 2298–99. He concluded that there was "some degree of limitation involved," but concluded that there was no "indication for limitation to include sitting, reaching in any direction, standing, walking, balancing, or use of hands." AR 2301. Dr. Rea made these determinations based on Sorensen's fibromyalgia diagnosis, but no other medical findings. AR 2301–02. However, Dr. Rea found that Sorensen's "self-reported symptoms," were inconsistent with "actual objective findings on examination or through diagnostic testing." AR 2302. Dr. Rea did recognize that Sorensen's prognosis had a "low expectation for any material improvement of function." AR 2302.

On December 21, 2017, The Hartford[5] concluded that Sorensen was disabled, because she could not perform her "Occupation." AR 3025–28. Under the second prong of the Plan's definition of disability, The Hartford determined that Sorensen was entitled to disability benefits for 24 months or through October 25, 2019. *See* AR 2944–45. Accordingly, The Hartford approved her application (on

---

[5] Senior Ability Analyst, Ann M. Maddaus, issued the approved claim for benefits.

that basis) for long-term disability benefits. AR 3025–28, 3258.

In January 2019, The Hartford began review of her long-term disability claim to determine whether Sorensen met the third prong (unable to perform "Any Occupation") of the Plan's definition of disability, which would allow her to continue her disability benefits until termination. AR 2944–45, *see also* AR 3252–53 (outlining reasons for termination of benefit payments). As part of The Hartford's review to determine Sorensen's ability to perform "Any Occupation," it retained Rafid Kakel, MD, and Janet Nunn, MD, to evaluate Sorensen's medical records to determine the extent of Sorensen's physical and mental disabilities, respectively.

In April 2019, the Social Security Administration ("SSA") Administrative Law Judge ("ALJ") found Sorensen totally disabled.[6] AR 1854–64. The Hartford received notice of the SSA determination and its basis prior to denying Sorensen's application for long-term disability benefits. *See* AR 1829.

On October 2, 2019, primary care provider, Heidi Walker filed a progress

---

[6] The Plan required Sorensen to apply for social security benefits, "when the length of Your Disability meets the minimum duration required to apply for such benefits. You must apply within 45 days from the date of Our request." AR 3256. The Plan further required Sorensen to request a hearing if her initial application was denied. AR 3256. Sorensen complied with these requirements, and, after receiving the SSA award, Sorensen was required to reimburse The Hartford for overpayment of Plan benefits. AR 1829.

report with The Hartford. AR 1661–62. Walker noted Sorensen's primary

conditions as major depressive disorder, PTSD, anxiety, and borderline personality

disorder. AR 1661. She also noted Sorensen's secondary conditions as

fibromyalgia, irritable bowel syndrome, disc disease, rheumatoid arthritis, and

Chiari malformation. AR 1661. Walker listed Sorensen's work restrictions as

follows:

- Sit: intermittently – 1 hour at a time for 1 hour in an 8-hour day
- Stand: intermittently – less than 1 hour at a time for less than 1 hour in an 8-hour day
- Walk: intermittently – 1 hour at a time for 1 hour in an 8-hour day

AR 1661–62. Walker further restricted lifting to 5 pounds, balancing, and driving

to up to 2.5 hours. AR 1662. Walker found that Sorensen could never bend, kneel,

or climb. AR 1662. Walker further noted that Sorensen's condition had

"retrogressed." AR 1662.

    On December 3, 2019, Dr. Kakel issued his report. AR 1535–40. In his

report, Dr. Kakel did not address any of Sorensen's medical conditions. However,

Dr. Kakel found the following work restrictions for Sorensen:

- Sit up to 30 minutes at a time for a total of 4 hours in an 8-hour day; with a 10-minute break every hour for stretching.
- Stand up to 30 minutes at a time for a total of 4 hours in an 8-hour day
- Walk up to 30 minutes at a time for a total of 4 hours in an 8-hour day

- Lift, carry, push and pull objects weighing up to 10 pounds and occasionally up to 20 pounds
- Constantly reach above your shoulder, at waist level, finger, handle and grip objects
- Occasionally bend, stoop, crouch and kneel
- Never climb ladders
- Occasionally climb stairs

AR 1537–38. Dr. Kakel recognized that Sorensen had functional limitations based on "disc desecration," "tendinosis" in left shoulder, mild osteo-arthritis in both hands. AR 1538. Dr. Kakel also concluded (based on his information from Dr. Nunn) that Sorensen had psychiatric impairments, which contributed to her medical conditions. AR 1538.

On December 4, 2019, Dr. Nunn issued her report. AR 1543. Dr. Nunn reviewed Sorensen's psychiatric conditions and noted that Sorensen had been diagnosed with "[Major Depressive Disorder], PTSD, Anxiety, Borderline Personality Disorder, Fibromyalgia, Chronic Pain, Rheumatoid Arthritis, Questionable Chiari Malformation, Neck, and Back Pain." AR 1543. Dr. Nunn concluded that Sorensen's mental disorders "exacerbate her chronic pain, fatigue, and subjective focus concerns." AR 1560. Dr. Nunn further noted that Sorensen has "conditions that are functionally impairing to the point where her work function is limited." AR 1560.

In December 2019, The Hartford,[7] relying on the reports of Dr. Kakel and Dr. Nunn, determined that Sorensen was not eligible for long-term disability benefits based on a physical condition, finding that she could perform "Any Occupation." AR 2859–67. However, it did determine that Sorensen met the third prong of the Plan's definition of disability based on a Mental Illness, which provided Sorensen long-term disability benefits for 24 months (until October 24, 2021) under the Plan. AR 2859–67, 3251, 3259.

In April 2020, Sorensen appealed the denial of long-term disability benefits based on her physical condition. AR 932–35, 2853. In response, The Hartford retained Roger Belcourt, MD, to review Sorensen's file. On June 22, 2020, Dr. Belcourt issued a report to The Harford. AR 917–27. Dr. Belcourt recognized that Sorensen had "a medical history significant for rheumatoid arthritis, lumbar spine degenerative disc disease, cervical spine degenerative disc disease, thoracic spine degenerative disc disease, fibromyalgia, hypothyroidism, irritable bowel syndrome without diarrhea, an anxiety disorder and a depressive disorder." AR 918. Dr. Belcourt found that Sorensen had functional limitations that required restrictions as follows:

- Sit: unrestricted

---

[7] Specialty Analyst, John L. Gong, issued the benefits decision.

- Stand: intermittently – 3 hours at a time for 6 hours in an 8-hour day
- Walk: intermittently – 2 hours at a time for 4 hours in an 8-hour day
- 

AR 923–24. He further restricted kneeling, crouching, and crawling to never and climbing stairs, stooping, and reaching to occasional. AR 924. Dr. Belcourt also concluded that Sorensen could occasionally lift, carry, push, and pull up to 20 pounds. AR 924. Dr. Belcourt concluded that only her degenerative disc disease and bilateral hand swelling and stiffness warranted restrictions. AR 924–25.

On August 11, 2020, Sorensen underwent a functional capacity assessment. AR 584–96. The assessment determined that Sorensen had functional limitations that required restrictions as follows:

- Sit: frequently (34-66%) provided the opportunity to change positions
- Stand/Walk: occasionally (1-33%)
- Bend/Reach, Climb Stairs: occasionally (1-33%)
- Lift/Carry: frequently 15 lbs; occasionally 30 lbs.

AR 584. Sorensen was determined to have a functional capacity rate of "sedentary demand capacity." AR 585. The assessment further revealed that Sorensen "could not perform an 8 hour/day, 5 day/week work schedule" at the sedentary level, because her fatigue issues require her lie down and pain levels increase with strenuous activity. AR 585.

On January 15, 2021, Dr. Belcourt reviewed additional medical records and the assessment. Dr. Belcourt did not alter his prior opinion with the new evidence.

AR 345–47.

In March 2021, The Hartford,[8] relying on Dr. Belcourt's recommendations, denied Sorensen's appeal, concluding that Sorensen was not physically disabled and was able to perform "Any Occupation." AR 2837–42.

This timely action under ERISA followed.

## III

## CONCLUSIONS OF LAW

**1.     Jurisdiction.**

A district court has jurisdiction over ERISA matters pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. ERISA allows a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

**2.     Standard of Review.**

A denial of benefits under an ERISA plan will be reviewed de novo by a district court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

---

[8] Appeal Specialist, Debra McGee, issued the denial of benefits on appeal.

When the benefits plan unambiguously confers discretion to determine eligibility for benefits or to construe the terms of the plan to the administrator, the exercise of that discretion is reviewed for abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963–65 (9th Cir. 2006) (en banc). Here, the plan unambiguously grants The Hartford discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of the Plan. *See* AR 3258, 3296. Thus, the abuse of discretion standard applies. "A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (citation omitted). To determine whether a plan administrator abused her discretion, the court "consider[s] whether application of a correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).[9]

---

[9] A motion for summary judgment in ERISA cases brings the legal questions before the district court. *See Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917,

(continued...)

### 3.    Administration & Interpretation of the Plan

The Hartford issued the Plan for Peter Kiewit Sons', Inc., which included

long-term disability insurance to its employees. AR 3239–76, 3283–3315. Under

the Plan, benefits are available if the employee becomes disabled. AR 3251, 3289.

However, if the disability results from mental illness, the benefits are limited to 24

months. AR 3251, 3289.

Sorensen argues that The Hartford failed to properly interpret its own Plan.[10]

Pl.'s Br. 6-11; Pl.'s Resp. Br. 11–14. She alleges that The Hartford breached its

duty "to review [her] claim for 'the exclusive purpose of providing benefits to plan

participants,' not for its own financial profit motivations." Compl. ¶ 30.

Specifically, Sorensen alleges that, under The Hartford's interpretation, everyone

with a mental illness cannot be physically disabled. Pl.'s Br. 11. Sorensen argues

that The Hartford improperly interpreted the Plan, when it failed to combine her

physical and mental disabilities, when assessing her disability from mental illness.

Pl.'s Resp. Br. 12–13.

Pursuant to the Plan, The Hartford has "full discretion and authority . . . to

---

[9](...continued)
930 (9th Cir. 2012). The usual tests for summary judgment do not apply. *Id.*

[10] At oral argument, Sorensen withdrew any claim for relief under 29 U.S.C.
§ 1132(a)(2) or § 1132(a)(3).

construe and interpret all terms and provisions of The [Plan]. This provision

applies where the interpretation of The [Plan] is governed by [ERISA]." AR 3258.

Accordingly, this provision provides The Hartford "the power and duty to interpret

the plan and to resolve ambiguities, inconsistencies and omissions and to decide on

questions concerning the plan and the eligibility of any Employee." *Bergt v. Ret.*

*Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002)

(cleaned up). "Under the abuse of discretion standard of review, 'the plan

administrator's interpretation of the plan will not be disturbed if reasonable.'" *Day*

*v. AT&T Disability Income Plan*, 698 F.3d 1091,1096 (9th Cir. 2012) (quoting

*Conkright v. Frommert*, 559 U.S. 506, 512 (2010)). The Ninth Circuit has outlined

three ways in which a plan administrator may abuse its discretion: (1)

"constru[ing] provisions of a plan in a way that clearly conflicts with the plain

language of the Plan"; (2) "interpret[ing] a provision in a way that renders

nugatory other provisions of the Plan"; and (3) "giv[ing] an interpretation that

lacks any rational nexus to the primary purpose of the Plan." *O'Rourke v. N.*

*California Elec. Workers Pension Plan*, 934 F.3d 993, 1001 (9th Cir. 2019)

(internal quotation marks and citations omitted).

     At issue here is the Plan's mental-illness limitation. Relevant here, is a

disability caused by (1) "Mental Illness that results from any cause" or (2) "any

condition that may result from Mental Illness." AR 3251. The Plan defines "mental illness" as "a mental disorder as listed in the current version of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association" and recognizes that it "may be caused by biological factors or result in physical symptoms or manifestations." AR 3259.

The Plan's definitions of "Mental Illness" make this case distinguishable from *Kunin v. Benefit Trust Life Insurance Co.*, 910 F.2d 534 (9th Cir. 1990), and *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir. 1993) (per curiam). In those cases, the plans were ambiguous and did "not make clear whether a disability qualifies as a 'mental disorder' when it results from a combination of physical and mental factors." *Patterson*, 11 F.3d at 950 (citing *Kunin*, 910 F.2d at 541). Here, the Plan is clear that "physical symptoms or manifestations" from mental illness are included in the definition. Courts have construed mental-illness limitations with similar clauses and definitions to require a "but-for" causation. *See George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 355–56 (5th Cir. 2015) (recognizing that courts have "interpreted the 'caused by or contributed to by' language to exclude coverage only when the claimant's physical disability was insufficient to render him totally disabled"); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 844 (7th Cir. 2009) (same); *see also Maurer v. Reliance Standard*

19

*Life Ins. Co.*, 500 F. App'x 626, 628 (9th Cir. 2012) (explaining that administrator did not abuse discretion where there was evidence showing that "in the absence of any mental or nervous disorder, Plaintiff would be physically capable of working"); *Gunn v. Reliance Standard Life Ins. Co.*, 399 F. App'x 147, 153 (9th Cir. 2010) (affirming decision to deny benefits because there was a reasonable factual basis for concluding that claimant's multiple sclerosis "alone was not disabling, and that, but for his psychiatric mental and nervous disorders, he would be able to work"). Thus, given the Plan language, The Hartford was within its discretion to interpret mental illnesses to be a "but for" causation.[11] This interpretation does not render the language nugatory. If a claimant were both physically disabled and mentally disabled, she would qualify for long-term disability. Similarly, if a claimant were physically disabled (with or without a mental illness component), she would qualify for long-term disability. However, if

---

[11] Sorensen argues that, because depression and anxiety are symptoms of fibromyalgia, exclusion for mental illness is improper. Although there could be some merit to this argument, there is no evidence in the record to support it. First, Dr. Rigney diagnosed Sorensen with anxiety and depression, as well as "illness anxiety and somatization." AR 1521. Dr. Rigney noted that Sorensen's "illness anxiety" was "likely the largest component of [Sorensen's] mental health woes" and that Sorensen "likely spen[t] large amounts of time worrying and ruminating over her medical conditions." AR 1521–22. Second, Sorensen's mental illness diagnosis was not limited to depression and anxiety secondary to fibromyalgia, but also included PTSD, bipolar disorder, anger disorder, social anxiety disorder, and borderline personality disorder.

a claimant were mentally disabled (but not physically disabled), she would only qualify for 24 months of disability payments under the plan. To conclude otherwise would render the mental-illness limitation meaningless. Accordingly, The Hartford did not abuse its discretion in construing the provisions of the Plan. *See O'Rourke*, 934 F.3d at 1001.

### 4. Eligibility for Benefits

ERISA requires "a special standard of care [for] a plan administrator, namely, that the administrator discharge its duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan," and process those claims by "provide[ing] a full and fair review of claim denials." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Under a general abuse of discretion analysis, a district court would construe the terms of the underlying plan and scan the record for medical evidence supporting the plan administrator's decision to determine whether the administrator abused its discretion in denying benefits to a claimant. *See Montour v. The Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). However, where the same entity (that funds the ERISA benefits plan) also evaluates the claims, the plan administrator faces a structural conflict of interest. *See id.* Thus, the application of the abuse of discretion standard requires "a more complex analysis." *Id.*

21

Given this conflict of interest, the Ninth Circuit set forth the "case-specific factors" that must be used in assessing whether the plan administrator abused its discretion in determining Sorensen's eligibility for benefits under the Plan. *See id.* Those factors include (A) whether a conflict of interest exists and, if so, "the extent to which a conflict of interest appears to have motivated an administrator's decision"; (B) "the quality and quantity of medical evidence"; (C) "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records"; (D) "whether the administrator provided its independent experts with all of the relevant evidence"; and (E) "whether the administrator considered a contrary SSA disability determination, if any." *Id.*

### A.   Conflict of Interest

In this case, The Hartford admits it has a structural conflict of interest. Thus, this court must weigh this factor, adjusting the weight given the factor based on the degree to which the conflict appears improperly to have influenced The Hartford's decision. *See Abatie*, 458 F.3d at 968. Importantly, it does not change the standard of review: abuse of discretion still applies. *See id.* at 969. However, the factor must be weighed in determining whether there was an abuse of discretion. *See id.* "Simply construing the terms of the underlying plan and scanning the record for

medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour*, 588 F.3d at 630. Accordingly, the court will adjust the level of skepticism when reviewing the plan administrator's explanation[12] for its decision, given the facts and circumstances in Sorensen's case. *See Abatie*, 458 F.3d at 968–69.

Hartford argues that the court should provide "no weight" to the conflict in light of its processes and procedures to eliminate bias. *See* Def.'s Br. 13–15. Sorensen argues that the court should give great weight to this factor, because The Hartford provided inconsistent reasons for denial of Ms. Sorensen's claim, failed to adequately investigate the claim, failed to credit reliable evidence, and denied physical disability benefits against the weight of the evidence.[13] *See* Pl.'s Br. 16–18; Pl.'s Resp, Br. 4–9.

---

[12] Although The Hartford had three different plan administrators review this case, the focus of this decision is on the Appeal Specialist's stated reasons for denial, unless otherwise noted.

[13] Sorensen argues that there is actual evidence of bias in The Hartford's Employability Analysis conducted by Krisha Kuykendall. Kuykendall conducted all three of the Employability Analyses on December 19, 2019, AR 1198–1201; December 20, 2019, AR 1472–75; and June 26, 2020, AR 891–94. The fact that the Employability Analyses were created by the same person, by itself, is not clear evidence of bias, because it was simply the application of the evidence provided by different experts.

"The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case." *Montour*, 588 F.3d at 630. In *Met Life Insurance Co.*, the Supreme Court explained that the factor should be more important when the "circumstances in the case suggest a higher likelihood" of playing a role in the decision, such as a history of biased claims administration. 554 U.S. at 117. There is no evidence of that circumstance in this record. The Supreme Court also suggested that the factor would play little importance in circumstances where the administrator "has taken active steps to reduce potential bias and to promote accuracy." *Id.* As The Hartford argues, it did take such steps in review of this claim during this process. However, the Supreme Court emphasized that "the significance of the factor will depend upon the circumstances of the particular case." *Id.* at 108. The Ninth Circuit explained that a conflict-of-interest review should be "informed by the nature, extent, and effect" that the conflict may have had "on the decision-making process." *Abatie*, 458 F.3d at 967.

On review of this record (as described below), the court gives moderate weight to The Hartford's conflict of interest.

### B.    Quality and quantity of the medical evidence

There does not appear to be any dispute that The Hartford was provided and obtained all of Sorensen's relevant medical records. It also appears that the experts

were provided these medical records. No one argues that the quality or quantity of this evidence is insufficient. However, as discussed later, The Hartford did not provide Dr. Kakel or Dr. Belcourt[14] with the SSA's contrary conclusion, despite The Hartford requiring Sorensen to file an SSA claim and the doctors' review of the medical evidence occurring after the SSA award was issued.

### C.    In-person evaluation or paper review of the records

The Hartford has the option to require a claimant to submit to an examination by a "[p]hysician, vocational expert, functional expert, or other medical or vocational professional of [its] choice." AR 3293. In this case, The Hartford chose not to utilize this option during any stage of its four-year evaluation of Sorensen's application. Thus, none of The Hartford's hired experts conducted an in-person independent medical evaluation to assess the disability impact of Sorensen's multiple diagnoses. Accordingly, The Hartford limited itself and its experts to a paper review of Sorensen's records.

Although in-person exams are not mandatory in making The Hartford's determination, "it is a relevant consideration [for the court], especially with respect

---

[14] The Hartford also did not provide Dr. Nunn with the SSA determination. However, because Sorensen is challenging whether she is ineligible for benefits based on her physical limitations, this court need not address Dr. Nunn's specific findings.

to conditions that are not susceptible to objective verification." *Hodge v. Hartford Life & Accident Ins. Co.*, 298 F. Supp. 3d 1332, 1343 (D. Idaho 2017) (citation omitted). Many of Sorensen's health conditions are not susceptible to objective verification and are exactly those conditions that should have alerted The Hartford to the necessity of an in-person evaluation and the evidence that it would provide. *See Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011) ("Although the ERISA does not require a plan administrator to request that a claimant undergo a medical examination before denying his or her claim, the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review."); *see also Salomaa*, 642 F.3d at 676 (noting that medical opinions rendered after in-person examination more persuasive than contrary opinions rendered following paper-only review of records).

Where a conflict of interest exists, this court weighs whether The Hartford conducted an in-person evaluation in determining whether The Hartford administrator abused its discretion. *See Salomaa*, 642 F.3d at 676. The choice not to have an in-person evaluation, given Sorensen's complex medical history, "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Montour*, 588 F.3d at 634 (alteration in the original) (citation

omitted). In reviewing The Hartford's decision and its basis, the court finds

troubling its lack of an in-person evaluation. First, Sorensen's diagnoses of

fibromyalgia and chronic fatigue syndrome (which diagnoses The Hartford and its

experts do not dispute[15]) are conditions that are "not easily determined by reference

to objective measurements." *See Saffon v. Wells Fargo & Co. Long Term*

*Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008). Thus, Dr. Belcourt's and Dr.

Rea's suggestions that the record lacked objective findings related to Sorensen's

fibromyalgia and chronic fatigue improperly ignore Sorensen's subjective claims

of chronic pain and fatigue.[16] *See Salomaa*, 642 F.3d at 678 ("Many medical

conditions depend for their diagnosis on patient reports of pain or other symptoms

. . . ."). Second, the weight given to Sorensen's different diagnoses and the extent

of Sorensen's suggested restrictions and limitations based on that expert's

determination are inconsistent (or ignored) among The Hartford experts. For

example, Dr. Rea provided functional limitations based on Sorensen's diagnosis of

fibromyalgia but not the other identified diagnoses of irritable bowel syndrome,

chronic headache, and degenerative joint disease. Whereas Dr. Kakel provided

---

[15] None of Sorensen's diagnoses appear to be questioned by either The
Hartford or its experts.

[16] Dr. Kakel did not address Sorensen's diagnosis of fibromyalgia in his
report.

stricter limitations than Dr. Rea, but based those restrictions on Sorensen's

degenerative disc disease.[17] And Dr. Nunn recognized that Sorensen's fatigue

would prevent her from working full time.[18] Third, even though Dr. Belcourt never

conducted an in-person evaluation, he never spoke to any of Sorensen's treating

medical providers about her records or her status.[19]

_____

[17] As explained in this decision, Dr. Belcourt also offered different
functional limitations. However, The Hartford's failure to have an in-person
evaluation (after two of its prior experts disagreed on the functional limitations and
relevant diagnoses) evidences bias in making its discretionary decision.

[18] Although Dr. Nunn suggested that Sorensen's fatigue was exacerbated by
her mental health, AR 1522, the record also indicates Sorensen has multiple
physical diagnoses that can cause fatigue, *see* AR 1861.

[19] Lastly, "[a]n insurance company may choose to avoid an independent
medical examination because of the risk that the physicians it employs may
conclude that the claimant is entitled to benefits." *Salomaa*, 642 F.3d at 676.
Although unclear, this situation seems indicated within The Hartford's claim notes.
The notes state:

> Once [requested medical] information is received Ability Analyst will
> review for any updated medical records versus forwarding to medical
> claims management for further evaluation versus need for an
> independent medical examination.
>
> If claim remains supported for mental health, Ability Analyst will
> monitor to medically necessary minimum premium plan; however if
> physical becomes primary again Ability Analyst will review for any use
> of mental health limit with medical claims management and consider
> CLC as lump sum settlement is not medically feasible considering
> Sorensen's multiple co-morbid conditions including major depressive
> disorder.

(continued...)

Thus, by not having an in-person examination, The Hartford's administrator appears not to have a thorough and accurate benefits determination, therefore indicating its determination was biased by its conflict of interest and abusing its discretion.

### D.    Independent experts' review

The Hartford had three separate independent experts review Sorensen's medical records.

First, Dr. Rea reviewed Sorensen's medical records and talked to Brett Smith, PA. AR 2298–2300. In visiting with Dr. Rea, Smith explained that "there were typical findings of fibromyalgia as well as fibromyalgia's pattern." AR 2300. He further noted that Sorensen's "fibromyalgia . . . was interwoven with not only physical but also an emotional and psychological overlay." AR 2301. Previously, in September 2017, Smith had given Sorensen the restrictions that she could sit, walk, and stand for up to one hour at a time for a two-three hour duration in an eight-hour day. AR 1825. On December 19, 2017, Dr. Rea concluded that Sorensen could work but that, because of her fibromyalgia, she would need

---

[19](...continued)
AR 2604 (cleaned up). This note seems to imply that The Hartford would ignore evidence of a physical disability (and forgo an in-person medical evaluation) if her mental-health disability remained.

restrictions. However, Dr. Rea did not note any limitations for "sitting, reaching in any direction, standing, walking, balancing, or use of hands." AR 2301–02. In fact, Dr. Rea did not address these limitations suggested by Smith. AR 2300.

Second, Dr. Kakel reviewed Sorensen's medical records and visited with several of her treating medical providers. AR 1579–93. On October 26, 2019, Dr. Kakel talked with Heidi Walker who told Dr. Kakel that Sorensen was totally disabled and stated that Sorensen would have difficulty doing "work with prolonged sitting." AR 1580. On October 26, 2019, Tyler Hepworth told Dr. Kakel that Sorensen had "no work restrictions but [Sorensen] cannot stay in the same position like sitting more than 30 to 45 minutes." AR 1580. Hepworth also stated that Sorensen may be partially disabled and noted concern with regard to the pain medication interfering with her job. AR 1580–81. On December 2, 2019, Monica Jarzmik told Dr. Kakel that she "had not seen the claimant since August 2019," and could not "render any opinion regarding disability." AR 1580. Dr. Kakel issued his report on December 3, 2019. AR 5179. Dr. Kakel concluded that Sorensen could work an 8-hour day with restrictions for walking, sitting, and standing.[20] AR 1582. Dr. Kakel did not address Sorensen's fibromyalgia or other diagnoses, but he did

---

[20] Dr. Janet Nunn also reviewed Sorensen's psychiatric impairments. AR 1582. Because Sorensen received benefits under the Plan for these impairments, the court does not address these findings further.

include restrictions and limits beyond those limitations suggested by Dr. Rea. However, The Hartford did not provide Dr. Kakel with the ALJ's decision, awarding social security disability benefits; thus Dr. Kakel did not have the opportunity to review all of the "relevant evidence." *See Montour*, 588 F.3d at 630, 634 (calling into question the impartiality of the plan administrator's consulting physicians, because the record indicates those experts lacked access to "all of the relevant evidence." (quoting *Metro. Life Ins.*, 554 U.S. at 118)).

Lastly, Dr. Belcourt reviewed Sorensen's medical records following Sorensen's appeal from denial of benefits. AR 917–23. Dr. Belcourt did not communicate with any of Sorensen's medical providers. He recognized Sorensen's diagnoses as: obesity, rheumatoid arthritis, lumbar spine degenerative disc disease, cervical spine degenerative disc disease, thoracic spine degenerative disc disease, fibromyalgia, hypothyroidism, irritable bowel syndrome without diarrhea, anxiety disorder, and depressive disorder. AR 923–24. Dr. Belcourt noted Sorensen's neck and back pain and hand swelling and stiffness were supported by the medical records. AR 925. But he concluded that her restrictions and limitations were not as limited as she claimed. *See* AR 925. Finally, Dr. Belcourt discounted Sorensen's diagnoses and complaints of chronic fatigue and fibromyalgia. AR 925. Dr. Belcourt concluded that medical records "fail[ed] to document abnormal physical

examination findings which could indicate widespread pain, allodynia, stiffness or poor sleep quality." AR 925.

Sorensen argues that all of the hired experts failed to address all of Sorensen's medical conditions or contrary evidence. Although the hired experts were not required to examine or address every medical condition in Sorensen's medical record, The Hartford was required to support its decision with more than "a modicum of evidence," especially given its conflict of interest. *Montour*, 588 F.3d at 626. Although The Hartford was not obligated to give deference to Sorensen's treating physicians over its own consulting physicians, it could "not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Here, The Hartford only credited its own expert, without any discussion of Sorensen's reliable medical evidence or her treating physicians' opinions. This reliance on Dr. Belcourt's conclusions (the basis of its final denial) is concerning. Dr. Belcourt did not talk to any of Sorensen's medical providers. Nor did he examine or talk to Sorensen. Pursuant to Dr. Belcourt's report, he limited his analysis of Sorensen's limitations from chronic fatigue and fibromyalgia to five

separate office visits[21] rather than Sorensen's entire medical file (as referenced in his decision). AR 925. This limitation resulted in Dr. Belcourt improperly concluding that there was a lack of objective evidence of disability from chronic fatigue or fibromyalgia.[22] *See Salomaa*, 642 F.3d at 677–78; *see also Gary v. Unum Life Ins. Co. of Am.*, 831 F. App'x 812, 814 (9th Cir. 2020) (noting

---

[21] These visits were (1) the June 11, 2019 office visit with Brett Smith, PA, to discuss Sorensen's sleep study, AR 1118; (2) the June 19, 2019 office visit with Dr. Ananda Walaliyadda for joint pain swelling and stiffness related to rheumatoid arthritis, AR 1800–03; (3) the July 5, 2019 office visit with Heidi Walker, PA for severe chronic fatigue, inflammatory arthritis prediabetes, and thyroid issues, AR 1814–15; (4) the July 22, 2019 office visit with Monika Jarzmik, NP for joint pain and stiffness, AR 1796–99; and (5) the July 30, 2019 office visit with Tyler Hepworth, PA for head, neck, back, elbows, hand knees, and feet pain, AR 1675–80. *See also* AR 925.

[22] Notably, the June 11, 2019 office visit upon which Dr. Belcourt relied was a follow-up appointment on Sorensen's sleep study. AR 1779–80. This appointment was not related to a claim of chronic fatigue or fibromyalgia. Furthermore, the Ninth Circuit has cautioned against requiring "objective tests to establish the existence of a condition for which there are no objective tests." *Salomaa*, 642 F.3d at 676–78 (specifically addressing chronic fatigue syndrome and fibromyalgia); *see also Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) ("Unlike most medical conditions capable of supporting a finding of disability, pain cannot be objectively verified or measured. While the physical conditions causing pain can usually be objectively ascertained, the pain itself cannot; the very existence of pain is a completely subjective phenomenon."). Additionally, it appears that Dr. Belcourt did not take into consideration the notes from those office visits that outlined Sorensen's complaints of pain. *See* AR 1675 (noting pain scale of 6); 1796 (noting pain scale of 6); 1796 (noting Sorensen was "uncomfortable due to pain" during the examination); 1801 (noting pain scale of 4); 1801 (noting Sorensen was "uncomfortable due to pain" during the examination); 1814 (noting pain scale of 6).

heightened skepticism should be used when "consultants cherry-picked certain

observations from medical records"); *Leger v. Tribune Co. Long Term Disability*

*Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (same). Notably, Dr. Belcourt

even suggested that fibromyalgia "does not support any functional limitations since

optimal management is obtained with regular exercise and activity, not by limiting

it." AR 925. In other words, Dr. Belcourt suggested that no one (who suffers from

fibromyalgia) would ever qualify for functional limitations. Nor did Dr. Belcourt

alter his conclusions after reviewing additional medical evidence, including a

functional capacity evaluation (which concluded that Sorensen demonstrated

functional abilities in the sedentary demand capacity, but was unable to work

because of fatigue). AR 346. Again, Dr. Belcourt found that "there [was] no

evidence of clinical deficits that would warrant" increased limitations and

restrictions.[23] AR 347. These conclusions are contrary to the medical evidence and

---

[23] It is unclear what objective evidence of "clinical deficits" Dr. Belcourt or
The Hartford wanted. *See Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461,
1463 (9th Cir. 1997) ("[I]f the plan administrators believe that more information is
needed to make a reasoned decision, they must ask for it."). Sorensen provided a
functional capacity assessment along with numerous assessments by her medical
providers. *See, e.g.*, *Lanier v. Metro. Life Ins. Co.*, 692 F. Supp. 2d 775, 788 (D.
Mich. 2010) ("A formal functional capacity assessment . . . is not the only
objective proof of a claimant's limitations. A qualified physician can correlate
clinical findings with the results of objective medical testing to render an opinion
on the ability of an individual to perform certain tasks.").

this circuit's case law. *Cf. Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004).

It is important to note that, Dr. Belcourt's limitations were less restrictive than Dr.

Kakel's.[24] *Compare* AR 923–24 *with* AR 1580–82. Yet, The Hartford does not

address these differences between its experts. Lastly, The Hartford did not provide

Dr. Belcourt with the ALJ's decision, awarding social security disability benefits,

allowing him to distinguish his opinion from that of the ALJ (given the similar

evidence).[25]

    Although The Hartford is entitled to credit its reviewing experts' opinions,

those opinions must properly address all of the relevant evidence. In this case, the

court questions whether Dr. Belcourt properly addressed the evidence. Thus,

weighing these facts and The Hartford's conflict of interest, this is another factor

suggesting that The Hartford abused its discretion in relying on Dr. Belcourt to

deny Sorensen benefits.

---

[24] All of Sorensen's treating physicians placed restrictions on Sorensen's ability to sit in an 8-hour day. The Hartford's own expert, Dr. Kakel, limited sitting to 30 minutes no more than 4 hours a day in an 8-hour day, with "a 10-minute break every hour for stretching." Yet, Dr. Belcourt suggested, without explanation, that Sorensen could sit without any restrictions.

[25] Sorensen challenges Dr. Belcourt's conclusions with regard to irritable bowel syndrome and fibromyalgia, asserting that he misconstrued the evidence. Because Dr. Belcourt did not properly assess Sorensen's medical record, the court need not address these specific claims.

### E.   Social Security Administration disability determination

"Evidence of a Social Security Award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion." *Salomaa*, 642 F.3d at 679. Although The Hartford was "not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process." *Montour*, 588 F.3d at 635 (quotation marks and citation omitted). "[A] proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Id.* at 636.

In this case, The Hartford required that Sorensen file for social security benefits. The ALJ reviewed Sorensen's medical records and SSA's consultative examinations and took testimony from Sorensen. *See* AR 1859–60. The ALJ considered Sorensen's medical record from April 2017 through April 2019; the same period of disability considered under the Plan. AR 1859. The ALJ found that Sorensen suffered from: "obesity; fibromyalgia; Hashimoto's disease; obstructive sleep apnea; depression; post traumatic stress disorder; degenerative disc disease of

36

the cervical lumbar and thoracic spine; Epstein Barr viral infection; irritable bowel syndrome; osmotic myelinolysis affecting her brain; and chronic fatigue syndrome." AR 1859. The consultative examination (through the SSA) revealed that she had "a less-than-sedentary residual functional capacity," in light of her fibromyalgia and her knees. AR 1862. The ALJ concluded that (given Sorensen's limitations) she was unable to perform based on her residual functional capacity. AR 1857. The Hartford was aware of this information prior to denial of the claim.

Although The Hartford attempted to eliminate bias by the process it used in evaluating the claim, it undermined that effort by failing to properly consider Sorensen's grant of social security disability benefits. The Hartford did not provide the ALJ's decision granting benefits to either Dr. Kakel or Dr. Belcourt (the experts who could have medically differentiated that decision). *See Montour*, 588 F.3d at 634. Instead, The Hartford itself determined, both in its initial decision and in its appeal decision, that the SSA award of benefits was not relevant to long-term disability benefits under the Plan. On both occasions, in making its independent determination, The Hartford made no effort to consider and meaningfully distinguish the SSA award of disability benefits to Sorensen, despite similar diagnoses. At most, The Hartford considered and accounted for the SSA's disability determination by acknowledging that the award was made and then

including boilerplate language to describe the differing standards for the award as the basis for distinguishing the SSA award. In The Hartford's first partial denial, it stated: "Though you are receiving Social Security Disability benefits (SSD), as we discussed with you and as explained in the SSD educational tool, it is possible to qualify for SSD but no longer continue to qualify for private disability benefits." AR 2859. The Hartford then referenced two letters explaining the differing standards for determining disability between the Plan and SSD. AR 2859. However, merely stating that the Plan and SSD have different standards for determining disability, without more, is not sufficient under *Montour. See also Pac. Shores Hosp.*, 764 F.3d at 1042 (explaining that a plan administrator abuses its discretion if it "renders a decision without explanation").

In The Hartford's second denial, it again acknowledged the award, but stated:

> [I]t is possible to qualify for SSDI, but no longer continue to qualify for private long-term disability (LTD) benefits from The Hartford. The standards governing receipt of these public and private benefits are different in critical ways. In determining entitlement to SSDI, the Social Security Administration (SSA) measures your condition against a unique set of federal criteria. By contrast, the continuing validity of a claim to benefits under a private LTD policy depends in part on the interpretation of the specific terms in the policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. LTD policy is a contract that must be consistently enforced according to its terms.

> In addition, the medical evidence in the SSA's possession and The Hartford's possession *may* be different. The decisions *may* be made with overlapping, but distinct, sets of medical evidence. In addition to medical evidence, The Hartford's decision *may* also be based on vocational and behavioral evidence, which the SSA is not required to use in the same way.

AR 2841 (emphasis added). Again, The Hartford did not make any comparison of medical evidence upon which the decision makers relied.[26] Rather, The Hartford emphasized the differing standards for evaluating the claim and then speculated on the reasons the medical evidence *may* differentiate the basis for the determination (without any discussion). This reasoning is insufficient under *Montour*.

Although there might have been valid reasons for The Hartford's decision, those reasons do not appear in its written decision. This court cannot substitute its judgment for that of the plan administrator.

*** 

Thus, the court finds:

1.      The Plan Administrator had a conflict of interest in administering this

---

[26] As noted above, "a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting . . . the medical evidence upon which the decisionmakers relied." *Montour*, 588 F.3d at 636. However, in this case, the administrative record did not include the SSA administrative record on which the ALJ's decision was made. If The Hartford's was unable compare and contrast the medical evidence, it was required to inform Sorensen "of the deficiency and to provide [her] with an opportunity to resolve the problem by furnishing the missing information." *Id.*

Plan. When considering the entire record, this court gives moderate weight to this conflict of interest as follows.

2.      The Hartford did not abuse its discretion in construing and interpreting the provisions of the Plan. Under The Hartford's interpretation, in order to qualify for long-term disability, a claimant must be physically disabled. If only mentally disabled, as defined by the Plan, a claimant would only qualify for 24 months of disability (which Sorensen received).

3.      Applying the factors, which must be used in assessing whether The Hartford abused its discretion in determining that Sorensen was not eligible for long-term disability benefits for a physical disability under the Plan:

a.      No one disputes that The Hartford was provided all of the medical evidence and obtained Sorensen's relevant medical records.

b.      The Hartford did not request that Sorensen complete an in-person medical evaluation, instead relying on a paper review of medical records. Given Sorensen's health conditions that were not "susceptible to objective verification," the failure to have an in-person evaluation (where a conflict of interest exists) suggests an abuse of discretion.

c.      Where a conflict exists, The Hartford abused its discretion in relying on Dr. Belcourt's evaluation to deny benefits on appeal. Dr. Belcourt never

had an in-person examination of Sorensen. Dr. Belcourt cherry-picked medical

records (using five office visits rather than her entire medical file) to support his

determination concerning Sorensen's chronic fatigue and fibromyalgia. Contrary to

Circuit precedent, Dr. Belcourt discounted Sorensen's claims of chronic fatigue

and fibromyalgia because of a lack of objective findings. The Hartford failed to

explain the inconsistencies between Sorensen's functional limitations as

determined by Dr. Belcourt and its other experts. Lastly, Dr. Belcourt was never

given the ALJ decision granting Sorensen benefits in order to distinguish his

conclusions from those of the SSA.

       d.    Although The Hartford administrators did consider the contrary

SSA disability determination, they merely referenced the differing standards

between an SSA claim and this claim, instead of comparing the medical evidence

upon which the decision was made, again resulting in an abuse of discretion

(weighing that a conflict of interest existed).

      Thus, The Hartford abused its discretion in determining that Sorensen was

not eligible for long-term disability benefits. Accordingly, Sorensen's motion for

summary judgment is granted, and The Hartford's motion for summary judgment

is denied. Judgment is entered in favor of Sorensen on her ERISA claim.

**IV**

## REMEDY

"Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 907 (9th Cir. 2016) (quoting *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003)). Sorensen argues that she should be awarded full disability benefits from October 24, 2021, until she turns 67 pursuant to the terms of the Policy. Pl.'s Br. 19. In its opening and response briefs, The Hartford did not argue for an alternative remedy, in the event that this court were to conclude that The Hartford abused its discretion.

The Ninth Circuit has explained that remand is appropriate in cases when a plan administrator "has misconstrued the Plan and applied a wrong standard to a benefits determination." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) (citation omitted). Those are not the circumstances here. The Hartford did not abuse its discretion in construing the Plan, but abused its discretion when reaching "the wrong conclusion" as to the benefits award. *See id.* Accordingly, without prejudice to its exercise of rights under the Plan, The Hartford shall pay long-term disability benefits to Sorensen in an amount equal to

the contractual benefit to which she is entitled. Such payments shall continue so long as Sorensen meets the terms and conditions of the Plan. The Hartford shall pay prejudgment interest on all benefits that have accrued prior to the date of this judgment. Sorensen is awarded attorneys' fees pursuant to 29 U.S.C. § 1132(g).

DATED:  **June 14, 2022**

_____

Honorable N. Randy Smith
Ninth Circuit Court of Appeals Judge